IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| v. | : | Criminal Action No. 07-48-GMS |
| TYRONE ROANE, | : | |
| Defendant. | : | |

**MEMORDANDUM IN SUPPORT OF DEFENDANT'S MOTION
TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS**

Defendant, Tyrone Roane, by and through his undersigned counsel, Edson A. Bostic, Federal Public Defender for the District of Delaware, respectfully submits this Memorandum of Law in support of his Motion to Suppress Physical Evidence and Statements. For the reasons set forth below, Mr. Roane seeks to exclude the Government's admission, at trial, of any and all physical evidence illegally seized by law enforcement officials on or about March 29, 2007, and any physical statements made during, or subsequent to, his illegal seizure and arrest.

**I. INTRODUCTION**

On April 3, 2007, a Grand Jury for the District of Delaware indicted Mr. Roane for possession of crack cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B), possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A), and being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On June 25, 2007, Mr. Roane filed a Motion to Suppress Physical Evidence and Statements. The grounds for Mr. Roane's motion related to his illegal seizure and arrest on March 29, 2007. On September 5, 2007, this Court conducted an evidentiary hearing to determine Mr. Roane's suppression motion and the

Government's response thereto.

Mr. Roane submits that law enforcement officials lacked reasonable suspicion to conduct the investigative stop that led to his arrest because the stop was based on a tip provided by an unreliable informant, and officers failed to independently corroborate the tip. See e.g., Illinois v. Gates, 462 U.S. 213 (1983). Mr. Roane further submits that the officers' warantless entry into the home of which he was an invited guest violated the Fourth Amendment. See Illinois v. Rodriguez, 497 U.S. 177 (1990). Finally, Mr. Roane submits that all evidence that was obtained after Mr. Roane's arrest should be suppressed because the abandonment of property was precipitated by the unlawful investigative stop and warrantless entry into the home. See United States v. Coggins, 986 F.2d 651 (3d Cir. 1993); See also Wong-Sun v. United States, 371 U.S. 407 (1963).

## II. FACTUAL BACKGROUND

### A. Investigative Summary

On March 29, 2007, Officer Brian Witte of the Wilmington Police Department received information from a confidential informant that a black male wearing a black and white printed jacket was selling narcotics from a home at 2201 N. Pine Street in Wilmington, Delaware. This home is owned by Victoria Jones, Mr. Roane's friend.

Based on this information, Officer Witte contacted Officers Shawn Gordon and Kurt Bryson and initiated surveillance of the Jones residence. The officers saw Mr. Roane, who matched the informant's description of the jacket, standing on the front porch.

The officers alleged that Mr. Roane entered the Jones residence as Officers Gordon and Bryson drove past the home in their police vehicle. Officer Witte alleged that he subsequently drove past the home and saw Mr. Roane enter the home for a second time.

Officers Witte, Gordon and Bryson simultaneously approached the home and alleged that Mr. Roane immediately began to reenter it. Officer Bryson allegedly told Mr. Roane that they wanted to talk to him and asked him to stop. Mr. Roane, however, declined these requests, reentered the home and shut the door.

Shortly thereafter, Officers Gordon and Bryson forcibly entered the home and pursued Mr. Roane through an open back door and into the back yard. Officer Witte went to the rear of the home and allegedly observed Mr. Roane exit the back door and enter the backyard, and throw what appeared to be a firearm. During this pursuit, one of the officers fired at, and hit, Mr. Roane with a taser. Mr. Roane was arrested, searched and found to be in possession of crack cocaine. Officer Witte subsequently recovered the firearm.

### B. Evidentiary Hearing Testimony

At the September 5, 2007, evidentiary hearing, the Government presented the testimony of Officers Witte and Bryson. Mr. Roane presented the testimony of Jaylisa Robinson, who was present at the home at the time prior to, and after, Mr. Roane's arrest and lived at the Jones residence. Mr. Roane recounts those portions of the testimony that are relevant to the determination of this Motion.

#### 1. Officer Witte's Testimony

Officer Witte testified that he received a tip from a "reliable source," which reported that a black male wearing a black and white jacket made a hand-to-hand drug transaction, and that the male had a large bag of crack cocaine in his hand when he made the deal. (Tr. 9). Officer Witte contacted Officers Gordon and Bryson for assistance and relayed the tip information. (Tr. 9).

According to Officer Witte, Officers Gordon and Bryson drove through the area in a marked vehicle, saw Mr. Roane standing on the front porch of the residence and saw him enter the residence.

(Tr. 9-10). Officer Witte testified that he also passed the residence, and saw Mr. Roane look directly at his marked police vehicle and enter the residence. (Tr. 10).

Officer Witte testified that the officers met at 23rd and Jessup and set up the following plan to approach Mr. Roane:

> I met them at 23rd and Jessup . . . because, if we went the correct way on these streets, [Mr. Roane] had a visual point that he would be able to get into the house before we were able to get there[.] I told Gordon and Bryson how we were going to go eastbound on 22nd Street. I was going to stop at the rear of the house, which is on the side of the house toward the rear, and they were going to continue to go onto Pine Street, go to the front of the house where the defendant was.

Tr. at 9-10.

After the officers set up their plan, Officers Gordon and Bryson drove to the front of the house. (Tr. 11). Officer Witte exited his vehicle, positioned himself "alongside the house at the back" and maintained a visual of the back of the house. (Tr. 11). Officer Witte testified that he could see through the residence's six-foot, wooden privacy fence and observed Mr. Roane run out of the back of the house. (Tr. 12). Officer Witte testified that he ran on the outside of the fence, alongside Mr. Roane, who looked at him and ran back towards the house. (Tr. 13). Officer Witte testified that Mr. Roane ran up onto a pile of rocks and made a throwing motion. (Tr. 13). Officer Witte further testified that he saw two white objects and a black object, which he believed to be a gun, being thrown in a northern direction toward the rear of the backyard of 2203 Pine Street. (Tr. 13).

Officer Witte testified that he continued to run alongside Mr. Roane as he moved westbound toward the rear of the yard, and that Mr. Roane ran back toward the rear door. (Tr. 14). According to Officer Witte, Officer Gordon opened the rear door, and Mr. Roane attempted to dive over the fence. (Tr. 14). Officer Witte testified that Officer Gordon shot Mr. Roane with a departmental

taser, and he landed on the sidewalk. (Tr. 14-15). Officer Witte testified that Mr. Roane attempted to jump up, but he tackled him to the ground and ordered him to place his hands behind his back. (Tr. 15). Officer Witte testified that Mr. Roane refused, and he punched him in the face and placed his hands behind his back. (Tr. 15).

Officer Witte testified that Mr. Roane was taken into custody without incident. (Tr. 15). Officer Witte also testified that he never accessed the backyard because the fence was locked, and that he never told Mr. Roane to stop during the pursuit. (Tr. 15).

On cross-examination, Officer Witte testified that the confidential informant, who provided the tip, had previously provided a drug tip on one prior occasion,[1] but no arrests were made based on that information. (Tr. 17-19). Officer Witte also testified that he knew the informant for some time, and acknowledged that his police report, which was prepared on the day of Mr. Roane's arrest, did not mention that the confidential informant had seen a hand-to-hand transaction. (Tr. 20).

Officer Witte further testified that the tip only provided a description of the individual's jacket, and that he did not see Mr. Roane involved in any activity which indicated that he made a drug transaction. (Tr. 21). Officer Witte testified that at the time the officers set up the plan to approach Mr. Roane, his intent was to stop him and to conduct an investigation based on the information he received. (Tr. 22). Officer Witte testified that he attempted to kick in the residence's fence prior to seeing Mr. Roane run out of the house because Officer Bryson advised him that Mr. Roane had entered the house. (Tr. 29, 34).

**2. Officer Bryson's Testimony**

Officer Bryson testified that after receiving Officer Witte's tip, he and Officer Gordon went

---

[1] It does not appear that the confidential informant's tip related to Mr. Roane.

down 22nd street, crossed over Pine and saw Mr. Roane, who matched the tip's description. (Tr. 37). Officer Bryson testified that as they crossed into the intersection, Mr. Roane looked toward them, got up and walked into the house. (Tr. 37). Officer Witte testified that this occurred at approximately 2:00 p.m. in the afternoon. (Tr. 38).

Officer Bryson testified that he was supposed to speak to Mr. Roane and tell him to stop pursuant to the officers' set up plan. (Tr. 39). Officers Bryson and Gordon traveled eastbound so that they could not be seen, and saw Mr. Roane sitting on the steps next to a female as they drove up to the residence. (Tr. 39). Officer Bryson testified that he had his window down at the time and said, "[h]ey, come here." (Tr. 39). According to Officer Bryson, Mr. Roane "immediately jumped up, . . . ran up onto the porch and into the house." (Tr. 39). Officer Bryson testified that he told Mr. Roane to stop, but he continued to go towards the door. (Tr. 39).

Officer Bryson testified that he exited the vehicle and headed for Mr. Roane, who went into the house. (Tr. 40). Specifically, Officer Bryson stated that "we were running up the steps as he went into the house, and he already shut the door. And then by the time my partner and I got up there, I initially tried to door . . . and [it] was locked." (Tr. 40). Officer Bryson testified that he opened the screen door, kicked in the front door and entered the residence with Officer Gordon. (Tr. 41). The officers had their guns drawn "for protection." (Tr. 41).

Upon entry, the officers did not see Mr. Roane. (Tr. 42). Officer Bryson testified that he went towards the stairs, and Officer Gordon went to the left. (Tr. 42). Officer Bryson testified that as he got to the bottom of the stairs, Officer Gordon yelled "[h]e's here. He's over here," and he heard the pop from the taser. (Tr. 42). Officer Bryson saw Officer Gordon standing outside the back door with the taser, and Mr. Roane on the ground. (Tr. 42).

6

On cross-examination, Officer Bryson testified that he was the driver of the police vehicle, and that "as I pulled up, I looked up onto the steps, and . . . said, [c]ome here. Then he didn't. He stood up. Then I told him to stop. And then he went right into the house." (Tr. 44-45). Officer Bryson testified that he did not see Mr. Roane engaged in any drug transactions prior to this point, and that Mr. Roane was "just sitting on the steps next to the female." (Tr. 46).

### 3. Ms. Robinson's Testimony

Ms. Robinson, who is 15 years old, testified that Mr. Roane is her "godfather," and that she has known him for a year and a half. (Tr. 49). Ms. Robinson stated that Mr. Roane had previously visited her at her home on several occasions, and, on the day of his arrest, was fixing a flat tire across the street. (Tr. 50-52, 56).

Ms. Robinson testified that Mr. Roane entered her house on two occasions to wash his hands, and, after the second time, sat with her on the steps. (Tr. 52). Ms. Robinson stated that Mr. Roane said that he had to use the bathroom, and "as soon as he got up, the police car came, [and the officers] just start[ed] running." (Tr. 52). Ms. Robinson stated that she did not hear the police speak to Mr. Roane, and that when he got to the door, the officers "hopped" out of the car, started to run, "bum-rushed" her and kicked in the door. (Tr. 53).

Ms. Robinson testified that she asked the officers what they were doing, but they kept kicking and pushing in the front door. (Tr. 53). Ms. Robinson stated that two or three more police cars arrived and started to help the officers, and that officers took out a gun and told her to get back. (Tr. 54). Ms. Robinson also testified that she saw Mr. Roane after his arrest, and that the officers punched him in his face and tasered him after he had been handcuffed. (Tr. 55, 65).

During cross-examination, Ms. Robinson testified that she was not allowed to have company

7

in her home when her mother was not present, and that she was not in school on the day of Mr. Roane's arrest. (Tr. 57, 59). Ms. Robinson also testified that she saw Mr. Roane everyday because he would stop by to check on her. (Tr. 58-59).

### III. ARGUMENT

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." See U.S. CONST. Amend. IV. The United States Supreme Court noted that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." Terry v. Ohio, 392 U.S. 1, 9 (1968) (citing Union Pacific R.R. Co. v. Botsford, 141 U.S. 250, 251 (1891). "As a general rule, the Supreme Court has interpreted the Fourth Amendment's reasonableness requirement to mean that seizures and searches must be based on probable cause and executed pursuant to a search warrant." United States v. Johnson, 238 F.Supp.2d 663 (D.Del. 2002).

If an officer does not have a warrant, he or she "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has reasonable suspicion that criminal activity is afoot." Id., citing United States v. Robertson, 305 F.3d 164 (3d Cir. 2002) (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)); see also Terry, 392 U.S. 1. Pursuant to Terry, reasonable suspicion of criminal activity is defined as "specific and articulable facts which, taken together with reasonable inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21 (stating that this "demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence."). In evaluating reasonable suspicion, courts must consider the totality of the circumstances. United States v. Valentine, 232

F.3d 350 (3d Cir. 2000).

Mr. Roane contends that the evidence must be suppressed because it is the fruit of the officers' unlawful activities. Law enforcement officials lacked reasonable suspicion to conduct the investigative stop of Mr. Roane, and lacked reasonable suspicion or probable cause to conduct a warrantless entry of the home in question. Thus, Mr. Roane's seizure was unlawful, and all evidence obtained after his arrest should be suppressed as fruit of the poisonous tree. See Wong-Sun v. United States, 371 U.S. 407 (1963).

### A. The Officers Lacked Reasonable Suspicion to Stop Mr. Roane.

If an investigatory stop is based on information provided to the police by an informant, the reasonableness of the stop will depend on the informant's reliability. See Illinois v. Gates, 462 U.S. 213 (stating that corroborating the details of an informant's tip is an important step in establishing the veracity of an informant). The Third Circuit and Supreme Court have consistently recognized that the government cannot rely on a tip unless it demonstrates the basis of the informant's knowledge and the informant's reliability or veracity, and that courts must consider the tip's content and other surrounding circumstances. See e.g., United States v. Ubiles, 224 F.3d 213 (3d Cir. 2000); see also United States v. Hill, No. CRIM.A.04-41-JJF, 2005 WL 1745662 (D.Del. July 19, 2005) (stating that corroboration is "particularly important when an informant has no past history of reliability.") .

In Valentine, the Third Circuit discussed the reliability of informant and anonymous tips, and the surrounding circumstances supporting such tips. See e.g., Florida v. J.L., 529 U.S. 266 (holding that officers lacked reasonable suspicion to make a Terry stop based on a "bare" anonymous tip that a black male standing at a bus stop carried a gun); United States v. Goodrich, 450 F.3d 552, 560 (3d Cir. 2006) (concluding that an informant's vague tip was reliable because of the police officer's prior

9

relationship with the informant, the informant's real-time narration of suspicious behavior and the suspicious activity matching a pattern of criminal activity of which the police were aware); United States v. Ubiles, 224 F.3d at 213 (rejecting police officers' sole reliance on a reliable tip, which stated that an individual carried a gun, to support a Terry stop). Although there is no requirement that corroboration can only come in the form of the suspect's criminal activities, Valentine demonstrates the significance of the totality of the circumstances when evaluating reasonable suspicion based on an informant's tip. See Valentine, (stating that while "[w]alking away from the police . . . would not give rise to reasonable suspicion by itself, even in a high crime area, . . . it is a factor that can be considered in the totality of the circumstances.").

In this case, the record demonstrates that the officers made the decision to stop Mr. Roane based on an unreliable informant's tip. The officers used the informant on one prior occasion that did not lead to an arrest, and the informant only provided a description of the suspect's jacket. (Tr. (Tr. 17-19). Although Officer Witte testified that the informant stated that he saw a hand-to-hand drug transaction, the officer acknowledged that his police report, which was prepared on the day of Mr. Roane's arrest, did not mention this information. (Tr. 20). Indeed, the informant's tip is akin to an anonymous informant's tip that requires corroboration of readily observable facts. See e.g., United States v. Roberson, 90 F.3d 75 (rejecting an anonymous tip where officers received "fleshless" anonymous tip of drug-dealing and observed no suspicious basis); Alabama v. White, 496 U.S. 325-26 (identifying the problems inherent in police reliance on an anonymous tip that, without "something more," warrant no police response or further investigation).

During the suppression hearing, the officers testified that they saw Mr. Roane sitting on the steps of the front porch and enter the house on two occasions, but observed no drug activity. Thus,

considering the totality of the circumstances, the officers lacked reasonable suspicion to conduct an investigative stop of Mr. Roane. Cf. Hill, 2005 WL 1745662, at *3 (stating that the officers took "several steps to independently ensure the veracity of the informant.")

### B. The Police Officers Lacked Probable Cause To Enter The Home Without a Warrant.

#### 1. Mr. Roane Has Standing To Challenge the Fourth Amendment Violation.

At the outset, Mr. Roane contends that he has standing to contest the Fourth Amendment violation present in this case. The Fourth Amendment protects a reasonable expectation of privacy, and police officers are required to obtain a warrant supported by probable cause to conduct a search into an area in which an individual has an expectation of privacy. See Illinois v. Rodriguez, 497 U.S. 177 (1990); Payton v. New York, 445 U.S. 573, 587 (1980) ("Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment.").

In Minnesota v. Carter, 525 U.S. 83 (1998), the Supreme Court recognized its prior holding that "in some circumstances, a person may have a legitimate expectation of privacy in the home of someone else." Id. at 89; see also Illinois v. Rakas, 439 U.S. 128, 143 ("[A]rcane distinctions developed in property and tort law between guests, licensees, invitees and the like, ought not to control."). Mr. Roane submits that he had an actual subjective expectation of privacy at the home, and that society recognizes that expectation.

Although Carter involved the use of a third-party's home for pure commercial purposes, the Court discussed the privacy interests of individuals who are overnight guests and those who are legitimately on the premises, and, faced with an "in between case," fully analyzed the nature of the visit before determining that the individuals had a fleeting connection to the home because of the

11

commercial purpose for the visit. Id. at 473.

Mr. Roane, who routinely visited the home and knew the owner and occupants of the residence, received permission to enter and to access the home. Although Ms. Robinson, the occupant who provided Mr. Roane with permission to enter the home, knew that her mother had a policy of not allowing anyone in the home, she nonetheless gave Mr. Roane permission to be there. The evidence does not demonstrate that Ms. Robinson told Mr. Roane about this policy, or that he was otherwise aware of it. Prior to his arrest, Mr. Roane had twice entered the home with consent, and had a reasonable and legitimate expectation of privacy at the home prior to the officers' unconstitutional violations. Thus, Mr. Roane has standing to challenge the Fourth Amendment violation.

### 2. The Police Officer's Warrantless Entry Into The Home Violated The Fourth Amendment.

The suppression hearing testimony demonstrates that the officers forcibly entered the home without a warrant based on probable cause or the owner's consent, and, in the absence of any exceptions to the warrant requirement, including exigent circumstances. Indeed, Officer Bryson's testimony is contradictory regarding the circumstances leading to the officers' forcible entry into the home.

During direct examination, Officer Bryson testified that he saw Mr. Roane sitting on the steps and said "hey come here" through his open window. Officer Bryson testified that Mr. Roane "immediately jumped up, . . . ran up onto the porch and into the house." (Tr. 39). Officer Bryson also testified, however, that he told Mr. Roane to stop, but he continued to go towards the door, and that "<u>we were running up the steps as he went into the house</u>, and he already shut the door. And then

by the time my partner and I got up there, I initially tried to door ... and [it] was locked." (Tr. 40) (emphasis added). On cross examination, however, Officer Bryson testified that "as [I] pulled up, [I] looked up onto the steps, and . . . said, [c]ome here. Then he didn't. He stood up. Then I told him to stop. And then he went right into the house." (Tr. 44-45).

Despite its contradictory nature, Officer Bryson's testimony suggests that the officers pulled up, saw Mr. Roane sitting on the steps and told him to "come here." Mr. Roane stood up and went into the home, and, as stated by Ms. Robinson, was already at the door before the officers exited their vehicle. Thus, the officers would not have had time to reach the stairs before Mr. Roane entered the home, particularly given his close proximity to the front door prior to the illegal stop.

Mr. Roane contends that he merely walked into the home, and that the officers kicked in the door without knocking, asking him to come outside, seeking Ms. Robinson's consent to enter the home or confirming whether Mr. Roane was an owner or occupant of the residence. The officers' conduct demonstrates a blatant disregard for the Fourth Amendment's protection of the home, and that they had no concern for who actually resided at the residence. Thus, all evidence obtained after the Fourth Amendment violation should be suppressed pursuant to the fruit of the poisonous tree doctrine expressed in Wong Sun.

### C.   Mr. Roane's Toss of the Drugs And Weapon Constitutes Forced Abandonment.

In Johnson, 238 F.Supp.2d at 670, this Court summarized the law regarding the moment that a person is seized for Fourth Amendment purposes, and the forced abandonment of property. Specifically, the Supreme Court determined that a seizure under the Fourth Amendment requires either: (1) physical force applied by the police on the suspect; or (2) submission by the suspect to the officers' assertion of authority. See California v. Hodari D., 499 U.S. 621 (1991). "A show of

authority by the police to which the subject does not yield is insufficient." Johnson, 238 F.Supp.2d at 670. Mr. Roane recognizes that he ran from the house after the police forcibly and unconstitutionally entered the premises, but submits that the facts demonstrate that any abandonment of property was "precipitated by an unlawful search and seizure." Id., quoting United States v. Coggins, 986 F.2d at 653 (3d Cir. 1993) and Clancy, The Supreme Court's Search for a Definition of a Seizure: What is a 'Seizure' of a Person Within the Meaning of the Fourth Amendment?" 27 AM.CRIM.L.REV., 619, 548 (1990) (stating that if a suspect abandons property in response to unjustified police actions, such evidence normally cannot be used against the accused). See also Wong Sun. Thus, all evidence seized as a result of the officers' ongoing Fourth Amendment violations must be suppressed.

## IV. **CONCLUSION**

For the foregoing reasons, the Court should exclude the government's admission, at trial, of any and all physical evidence and statements that were obtained in violation of Mr. Roane's Fourth and Fifth Amendment rights.

Respectfully submitted,

/s/
Edson A. Bostic, Esquire

Attorney for Tyrone Roane

Federal Public Defender
One Customs House
704 King Street, Suite 110
Wilmington, DE 19801
(302) 573-6010

Dated: September 27, 2007