IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Criminal Action No. 07-48-GMS |
| Plaintiff, : | |
| v. : | |
| : | |
| TYRONE ROANE, : | |
| : | |
| Defendant. : | |

### GOVERNMENT'S POST-HEARING REQUEST TO SUMMARILY DENY THE DEFENDANT'S MOTION TO SUPPRESS

The United States, by and through Colm F. Connolly, United States Attorney for the District of Delaware, and Shawn E. Martyniak, Special Assistant United States Attorney for the District of Delaware, hereby requests the Court to deny the Defendant's *Motion to Suppress Physical Evidence and Statements*.

### I. FACTUAL ALLEGATIONS.

The Government submits the following factual allegations:

1. On March 29, 2007, Wilmington Police Officer Corporal Witte learned, from a reliable source, that an individual at 22nd and Pine Streets in the city of Wilmington, Delaware was observed conducting a drug transaction. The suspect was described as a "black male wearing a black and white printed jacket." (T. at 9).

2. Shortly after receiving the information, Wilmington Police Officers Gordon and Bryson responded to 22nd and Pine Streets in the city of Wilmington, Delaware. (T. at 9).

3. Wilmington Police Officers Gordon and Bryson were notified of the information and responded to the location. The Officers observed an individual matching the description given to police on the porch of 2201 N. Pine Street. The individual was later determined to be Tyrone

Roane, herein "defendant." Upon observing the fully marked police cruiser, the defendant quickly entered the front door of the residence. (T. 9-10).

4. After these officer drove past, Corporal Witte the defendant. Corporal Witte also made eye contact with the defendant. The defendant then fled into the residence. (T. at 10).

5. The Officers then drove away from the residence and met at 23rd and Jessup Streets. At that location, the Officers developed a plan to approach the residence. The Officers determined that they would travel against the flow of traffic up 22d Street with Corporal Witte stopping at the rear of the house and Officers Gordon and Bryson continuing to the front of the house. (T. at 10). The Officers then enacted the plan. (T. at 11).

6. Officers Gordon and Bryson approached the residence. (T. at 39). Officer Bryson told the defendant to stop and approach the police vehicle several times. The defendant ignored the request and fled toward the front door of the residence. The defendant then entered 2201 N. Pine Street, closing the door behind him. (T. 39-41).

7. Corporal Witte was located to the rear, outside of the property of 2201 N. Pine Street. (T. at 11). A short time later, the defendant exited the rear of the dwelling in an attempt to leave. Upon exiting the house, the defendant made eye contact with Corporal Witte. (T. at 13).

8. Upon making eye contact with Corporal Witte, the defendant began running around the rear yard searching for avenues of escape; however, every attempt made by the defendant was thwarted by Corporal Witte. (T. 13-14).

9. At one point, while running around the rear yard, the defendant stepped up onto a pile of rocks and threw a black handgun and two white objects over the fence into the rear yard of 2203 N. Pine Street. The defendant then ran back towards the rear of the residence. (T at 13).

10. Officers Gordon and Bryson gained access to 2201 N. Pine Street by kicking the door in. Officer Gordon then ran to the rear of the residence and out the back door. (T. at 41). The defendant, now attempting to flee from both officers, ran from the back of the residence and attempted to jump over a fence in the backyard. (T. at 14). As the defendant attempted this escape, Officer Gordon deployed his TASER weapon. The defendant was struck with the electrodes from the TASER and fell to the ground. He quickly stood back up and began another attempt to flee. (T. 14-15).

11. Corporal Witte then reached the defendant, took him to the ground, and ordered him to place his hands behind his back. The defendant failed to comply with the Corporal's commands by placing his hands under his body. Corporal Witte then struck the defendant in the face causing the defendant to comply. The defendant was then taken into custody. (T. at 15).

12. Corporal Witte then responded to the rear yard of 2203 N. Pine Street and conducted an area search. The Officer located a Ruger .22 caliber handgun and two clear plastic bags containing crack-cocaine. (T. at 16).

13. As a result of the chase, stop, and subsequent arrest, the defendant is charged with three separate violations of federal law: 1) Possession with intent to distribute more than five (5) grams of cocaine base ("crack")(21 U.S.C. §§ 841(a)(1) and (b)(1)(B)), 2) Possession of firearm in furtherance of a drug trafficking crime (18 U.S.C. § 924(c)(1)(A)), and 3) Possession of a firearm by a prohibited person (18 U.S.C. §§ 922(g)(1) and 924(a)(2)).

14. On September 15, 2007, a Suppression Hearing was heard before Chief Judge Gregory M. Sleet in the U.S. District Court for the District of Delaware. The Government presented two witnesses, Corporals Bryson and Witte of the Wilmington Police Department.

3

The defense presented one witness, Jaylisa Robinson.

15. The Government respectfully requests the Court deny the defendant's *Motion*. The Government submits that the defendant has failed to produce a credible witness to establish standing. Even if the Court were to find validity in the testimony of the defendant's witness, the defendant has failed to establish standing required to contest the entry of the residence and subsequent seizure of the gun and cocaine by the Officers. Additionally, the Government is not required to disclose the anonymous source that led to the arrest of the defendant.

## II. LEGAL ARGUMENT.

### A. Lack of Credibility of the Defense Witness.

#### 1. Facts.

At the Suppression Hearing, the defendant produced one witness, a Ms. Jaylisa Robinson. Ms. Robinson is a 15 year old female with some relation to the defendant; Ms. Robinson claims that the defendant is her godfather, yet she testified that he was not "legally her godfather." (T. at 56). Ms. Robinson lives with her mother in the house that the police entered to chase the defendant. (T. at 49).

Ms. Robinson made many other questionable claims during her testimony. She testified that she let the defendant in the house after he dirtied his hands fixing a car (T. at 51). Then on cross, she could not recall what type of car it was; she could not recall if the car was big or small, or how new the car was. About the only thing she knew about the car was that it was green. (T. 59-60).

Ms. Robinson testified that additional police arrived before the officers kicked the door in. (T. at 54). Officer Bryson testified that he and Officer Gordon were present at the front of the

residence. (T. at 41). Among other lapses in memory, Ms. Robinson testified that she could not remember the officers present during the incident, which officers contacted the defendant, which officers kicked in the door, whether or not the officers separated or remained together once in the residence, nor could she recall how many officers entered the residence. (T. 60-63).

Ms. Robinson also testified, on direct, that she saw the defendant "while he was arrested." She further testified that she saw the defendant in handcuffs and the police officers punching him in the face. She testified that the officers tased [sic] him after he was in handcuffs. (T. at 55). The officers testified that Officer Gordon tasered the defendant as he attempted to leave the rear yard. (T. 15, 42). Ms. Robinson also testified that after the Officers entered the residence, she left the area to call her mother from her cousin's home and the defendant was gone from the scene when she returned. (T. at 63-65).

Ms. Robinson testified that Cpl Witte was inside of her home when she returned from calling her mother. (T. at 64). Cpl Witte testified that he never responded inside of the residence. (T. at 16). The defense witness also testified that the police did not say anything to the defendant prior to the Officers chasing him (T. at 52); Officer Bryson testified that he told the defendant to come to him, the defendant looked in his direction, and then he immediately jumped up and up to the porch and into the house. (T. at 39). Officer Bryson testified that Ms. Robinson was next to the defendant (T. at 39); it is a bit of a reach to believe that the police specifically contacted the defendant and his response was to run into the dwelling and lock the front door, and also believe that the Officers did not say anything to initiate contact with the defendant. The witnesses lack of knowledge regarding the circumstances surrounding the arrest of the defendant combined with her fantastical claims regarding the police actions call into question the veracity of her testimony.

### 2. Law.

Generally, it is the role of the fact-finder to take into account the credibility of the witnesses that have testified before the Court. In the context of a suppression hearing, it is the Judge, rather than the Jury, that plays the role of the fact finder. Credibility determinations are within the sole province of the judge as the fact finder in a suppression hearing. *Glover v. Wander*, 2007 WL 1725236 at 7 (W.D.Pa., 2007).

Generally, the government, which bears the burden of proof on the issue, *see United States v. Johnson*, 63 F.3d 242, 245 (3d Cir.1995), will present witnesses who describe the steps leading up to the challenged search or statement, in an effort to demonstrate full compliance with constitutional requirements. These witnesses will then be rebutted by a defense witness, who will describe facts demonstrating departures from well-settled Fourth and Fifth Amendment precedent. The Court then weighs these competing versions of the same events, and makes factual findings based on which witness the Court finds to be more credible. *United States v. Davis*, 1995 WL 702530 at 4 (D.Del.,1995).

In a jury trial, the Court instructs the factors that the fact-finder may take into account when considering the credibility of a witness. Those factors include: witness' intelligence, the opportunity the witness had to have seen or heard the things testified about, the witness' memory, any motives that witness may have for testifying a certain way, the manner of the witness while testifying, whether that witness said something different at an earlier time, the general reasonableness of the testimony, and the extent to which the testimony is consistent with other

evidence that you believe.[1] Among other notes, the proposed Third Circuit Model Jury Instructions includes such language as, "(2) The quality of the witness' knowledge, understanding, and memory; (3) The witness' appearance, behavior, and manner while testifying; (4) Whether the witness has an interest in the outcome of the case or any motive, bias, or prejudice;...(7) Whether the witness' testimony is consistent or inconsistent with other evidence you believe. Draft *Model Jury Instructions*, 3d Circuit, § 1.10. Other Circuit Courts include language, such as, "Ask yourself how good the witness's memory seemed to be.", "Did the witness seem able to accurately remember what happened?", "Ask yourself how the witness acted while testifying. Did the witness appear honest? Or did the witness appear to be lying?"[2]

In the case at bar, the witnesses credibility is crucial because: 1) the witness' memory lacked recollection of events central to events surrounding the defendant's arrest; 2) the defense witness' testimony contradicted the Officer's testimony. When taking into account not only the defense witness' actual testimony, but also her demeanor on the stand, her lack of recollection of details, and her claims regarding police action during the incident, the witnesses credibility is called into question. Furthermore, when her testimony and demeanor is compared to the Officer's testimony, the discrepancies cannot be reconciled. The government submits that when taking all factors into account, the defense witness lacks any credibility. As such, the defendant has presented no credible evidence that establishes that he had standing; thus, his motion should be denied.

---

[1] Draft Model Criminal Jury Instructions, 3d Circuit, § 1.10. Model Criminal Jury Instructions for the District Courts of the Eighth Circuit § 1.05, Pattern Jury Instructions: First Circuit, Criminal Cases § 1.06

[2] Pattern Criminal Jury Instructions: Sixth Circuit § 1.07.

### B. Defendant does not have standing to contest the search.

If the Court finds the defense witness to be credible then the Government submits, alternatively, that the defendant has failed to establish standing. The defendant has failed to establish standing because he did not have a reasonable expectation of privacy in the home or its yard.

#### 1. The defendant has no reasonable expectation of privacy in the house.

##### a. Background.

The defense witness testified that she had known the defendant for approximately a year and a half. (T. at 49). The witness also testified that she allowed the defendant into her home two times on the date of arrest for the sole purpose of washing his hands. (T. at 51). The minor child who gave the defendant access to the house was not allowed to let people in the home when her adult mother was not home; the mother was not home when this incident occurred. (T. at 59). When the police confronted the defendant, he was not in the house, but rather, outside the home on the steps. (T. at 39). Furthermore, no evidence was ever seized from the house until after the defendant discarded the illegal contraband. Finally, the defendant's relationship to the family is somewhat tenuous. It appears that he merely knew the family from seeing them in the neighborhood. (T. 58-59).

##### b. Case Law.

The Fourth Amendment right to be free from unreasonable searches and seizures is a personal right and a defendant must establish standing in order to assert that right. *See United States v. Hebron*, 243 F. Supp. 2d 90, 96 (D. Del. 2003). *See also United States v. Padilla*, 508 U.S. 77, 81-82 (1993); *Government of Virgin Islands v. Williams* 739 F.2d 936, 938 (3d Cir. 1984). The burden of establishing standing to raise a Fourth Amendment challenge rests with the

8

defendant. *See United States v. Hebron*, 243 F. Supp. 2d 90, 96 (D. Del. 2003). *See also United States v. Salvucci*, 448 U.S. 83, 86-95 (1980); *Rakas v. Illinois*, 439 U.S. 128, 130 n. 1 (1980).

In order to establish standing, an individual challenging a search must have a reasonable expectation of privacy in the property searched. *See Rawlings v. Kentucky*, 448 U.S. 98, 104-106 (1980). A subjective expectation of privacy is legitimate if it is "'one that society is prepared to recognize as "reasonable"'" *Rakas v. Illinois*, 439 U.S. 143-44 n. 12 (1980) quoting *Katz*, 389 U.S. 347, 361 (Harlan, J. concurring)(1967). In *Rakas*, the Court continued, "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Id.*

### c. *Minnesota v. Carter.*

In *Minnesota v. Carter*, the Court "...one who is merely present [in the home] with the consent of the householder may not [claim the protection of the Fourth Amendment]." *Minnesota v. Carter*, 525 US 83, 89 (1998). In *Minnesota v. Carter*, a police officer received a tip that individuals were bagging cocaine in a ground floor apartment. A police officer walked by the apartment and looked into a closed window of the apartment. The officer, looking through a gap in the closed blind, observed the bagging operation for several minutes before notifying headquarters. While a search warrant was prepared, Carter and another individual left the apartment. The vehicle they were traveling in was stopped. The vehicle was searched and a handgun, forty-seven (47) grams of cocaine, and other paraphernalia was recovered. An apartment search yielded additional packaging materials and cocaine residue. *Id.* at 85-86.

Carter filed a "Motion to Suppress" on the grounds that officer's observation was an unreasonable search in violation of the Fourth Amendment. *Id.* at 87. The trial Court denied the

9

Motion and the Minnesota Court of Appeals ruled that Carter did not have standing to contest the search. The Minnesota Supreme Court ruled that Carter did have standing and the case was taken to the Supreme Court of the United States. *Id.* at 87.

The Supreme Court ruled that Carter did not have standing. The main thrust of the Courts argument was that the defendant was engaged in a purely commercial transaction. *Id.* at 90. However, the Court also looked at the fact that the defendants "were only in the home for a matter of hours" and also looked to the previous relationship of the homeowner and the defendant stating, "[t]here is no suggestion that [the owners] had a previous relationship with Thompson." *Id.* at 90.

### d. Case Law.

In 1960, the United State's Supreme Court decided *Jones v. United States*. In the case, Jones alleged that narcotics obtained by police during a search of another's apartment should be suppressed in the case against him because of an illegal search by the police despite the fact that Jones was not the listed occupant of the apartment. The United States Supreme Court held, in part, that "anyone legitimately on the premises where a search occurs may challenge its legality by way of a motion to suppress. *Jones v. United States*, 362 U.S. 257, 264, 267 (1960).

However, in *Rakas v. Illinois*, the Court, while not disturbing the result of Jones, rejected the "legitimately on premises" logic writing, "...[legitimately on premises] creates too broad a gauge for measurement of Fourth Amendment rights." *Rakas v. Illinois*, 439 U.S. 128, 142 (1978). The Court came to the conclusion that, "...Jones on its facts merely stands for the unremarkable proposition that a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place." *Id.* at 143. "*Rakas* thus recognized that, as an overnight guest, Jones

was much more than just legitimately on the premises." *Minnesota v. Olson*, 495 U.S. 91, 98 (1990). Essentially, the *Rakas* decision determined that a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and his expectation is reasonable. *Rakas*, 439 U.S. at 143-44, n. 12.

In *Minnesota v. Olson*, the United States Supreme Court applied this logic in determining that Olson did have standing to contest a search by police officers. *Minnesota v. Olson*, 495 U.S. 91 (1990). In *Olson*, the defendant was located hiding in a closet in the house. *Id.* at 94. The Court also wrote, "Olson, who had been staying at Ecker's home for several days before the robbery, spent the night of the robbery on the floor of the Bergstroms' home, with their permission. He had a change of clothes with him at the duplex." *Id.* at 97.

In cases where the defendant has been found to have standing the Court routinely looks to the defendant's status vis-a-vis the dwelling. In *Jones*, the defendant was at the apartment of a friend, he had a key to the apartment, and he had stayed over at least one night at the apartment, and had at least one suit and shirt at the apartment. *Jones*, 362 U.S. at 259. In *Olson*, the Court took into consideration the fact that the defendant had stayed at the house the previous few days and had a change of clothes at the apartment, i.e. Olson was a houseguest.

In the case at bar, the defendant has shown no evidence that he ever stayed at the house for any length of time that would give rise to status as a houseguest. In fact, his access to the house was limited to use of the sink to wash his hands. Additionally, the defendant was not in the house when he fled from the police, nor was any contraband located within the residence.

### e. Conclusion.

In the case at bar, the defendant's sole purpose for entering the house was to wash his hands. (T. at 51). More importantly, at the time police contact, the defendant was located

11

outside of the home on the front steps. (T. at 39). Furthermore, the defendant was not even allowed in the house because the owner was absent. (T. at 59). The defendant has failed to show a "legally sufficient interest" as the Court has generally recognized it. The mere minutes the defendant was in the home, without permission of a legitimate consenting individual, is not enough to create a reasonable expectation of privacy. Society does not recognize a privacy interest created, nor a legally sufficient interest developed in activity such as the defendant was engaged in.

### 2. The defendant was not in custody until after he discarded the gun and drugs.

### a. Background.

Upon receiving Officer Bryson's commands to stop and approach the Officer's vehicle, the defendant instead fled into 2201 N. Pine Street and subsequently out the back door. (T. 39-42). As the defendant attempted to flee the scene, he encountered Corporal Witte and continued his attempt to flee. (T. 13-14). As he ran around the backyard, avoiding the police contact, he threw a handgun and two baggies of crack-cocaine into an adjoining yard. (T. 13-14). As the defendant continued to evade the officers, he attempted to flee by hopping the fence; during this attempt the defendant was TASERED. (T. at 14). The Government concedes that the defendant was in custody after Officer Gordon TASERED him. However, prior to being in police custody, the defendant discarded the firearm and cocaine; the Officers did not violate the defendant's rights in recovering the abandoned property.

### b. Caselaw.

The defendant's Fourth Amendment rights were not violated because he was not "in custody" until after he discarded the gun and narcotics. The defendant's motion seems to based on the theory that the Wilmington Police Officers lacked reasonable suspicion to stop Mr.

Roane.³ However, Mr. Roane was not stopped, detained, or in custody prior to discarding the handgun and cocaine.

Police are vested with the constitutional authority conduct a limited, warrantless, investigatory stop if the officer has a reasonable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 88 (1968). During a *Terry* stop, the detention constitutes a "seizure" within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 808 (1996). However, the Third Circuit has recognized that the Fourth Amendment does not become relevant until the moment of seizure, and it is at that time that the presence or absence of reasonable suspicion evaluated. *United States v. Brown*, 448 F. 3d 239, 245. (3d Cir. 2006). The Supreme Court has ruled that "attempted seizures are beyond the scope of the Fourth Amendment." *County of Sacramento v. Lewis*, 523 U.S. 883, 845 n. 7 (1998).

The United States Supreme Court has made clear that in order to constitute a seizure of a person there must be either the application of physical force or submission, by the suspect, to the Officer's show of authority. *California v. Hodari D.*, 499 U.S. 621, 626-27 (1991). A show of authority by the police to which a subject does not yield is insufficient. *See id.* Moreover, if no physical force accompanies the show of authority, and an individual then chooses to ignore the show of authority, there is no seizure until the officer applies physical force or the individual submits to the show of authority. *See id.* at 624-627.

### c. Conclusion.

The police had reasonable suspicion to stop the defendant. At the time of the seizure the police had ample suspicion that the defendant was engaged in criminal activity. The police were

---

³In paragraph twelve of the defendant's pre-hearing motion he wrote, "[a]t the outset, the police officers lacked reasonable suspicion to conduct an investigative stop of Mr. Roane."

13

acting on a reliable source, the defendant matched the description given by the source, the defendant fled after the police approached and asked to speak to him, the defendant made eye contact with an officer in the back-yard of the residence he fled into, while fleeing the Officer witnessed the defendant discard a firearm and crack-cocaine. All of this information was known to the Officers prior to the seizure of the defendant.

Additionally, the defendant cannot claim a violation of his Fourth Amendment protections until after he is seized. Also, under the ruling of *Brown*, the point of seizure is also the point that the presence or absence of reasonable suspicion must be evaluated. The initial, unsuccessful attempts by the officers to seize the defendant do not trigger his Fourth Amendment claims

### 3. The defendant's rights were not violated when Officers seized abandoned property.

After the defendant threw the crack cocaine and firearm from his person into the backyard of the adjacent property at 2203 N. Pine Street, the items became abandoned property. As abandoned property, the police were free to recover the contraband without violating any of the defendant's rights.

In *Abel v. U.S.*, the Supreme Court determined that warrant-less searches and seizures of abandoned property did not violate the Fourth Amendment. *Abel v. U.S.*, 362 U.S. 217 (1960). The Court wrote, "[t]here can be nothing unlawful in the Government's appropriation of . . . abandoned property." *Id.* at 241.

In the case at bar, the defendant fled the residence and upon seeing Corporal Witte began running around the backyard. The defendant then stood atop a rock pile and discarded a firearm and nearly eighteen grams of crack cocaine into the adjacent property at 2203 N. Pine Street; the contraband was not located in the yard where the defendant was located. Once the defendant

discarded the contraband, the Officers were free to recover the items.

### 4. The Government does not have to disclose the identity of its informant.

#### a. Background.

At the Suppression hearing the Government objected to the defendant's attempts to identify the Informant that led to the police officers contacting the defendant. (T. at 17-18). The Court determined that the issue was potentially ripe. (T. at 18). The Government argues that it does not have to disclose the identity of its informant.

#### b. Caselaw.

The privilege to maintain the anonymity of an confidential source is grounded in safety concerns for citizen witnesses; it is designed to encourage citizens to report criminal activity. *United States v. Johnson*, 302 F.3d 139 (3d Cir. 2002); *see United States v. Jiles*, 658 F.2d 194, 198 n.4 ("In order to ensure the effectiveness of our law enforcement agencies, we must continue to encourage, through the proper use of the Government's privilege, the public to come forward with information."). A defendant wishing to overcome the privilege must demonstrate initially that the disclosure "is relevant and helpful to [his] defense" or "is essential to a fair determination" of his guilt. *United States v. Brown*, 3 F.3d 673, 679 (3d Cir. 1993) (quoting *Roviaro v. Unites States*, 353 U.S. 53 at 60-61 (1957). "[M]ere speculation as to the usefulness of the informant's testimony to the defendant is insufficient to justify disclosure of his identity." *United States v. Bazzano*, 712 F.2d 826, 839 (3d Cir. 1983). *See also United States v. Day*, 384 F.2d 464, 469 (3d Cir. 1967) ("[I]f disclosure on a mere supposition is required in every instance the interests of law enforcement in combating [crime] will be detrimentally affected by the emasculation of its only effective weapon – the informer.") (McLaughlin J., concurring).

In *Jiles*, the Third Circuit identified a "spectrum," on the extreme end of which are

15

*Roviaro* and similar cases where the defendant is likely to prevail because he can shown that the informant's identity must be disclosed to ensure a fair trial. 658 F.2d at 196-197. However, "[a]t the other end of the spectrum, are cases in which the informant was not an active participant or eyewitness, but rather a mere tipster. In such cases courts have generally held that the informant's identity need not be disclosed." 658 F.2d at 197.

The court of appeals concluded in *Jiles* that the government was not required to disclose the identity of an eyewitness confidential informant because the informant was not the only witness to the crime, the government did not intend to call the witness at trial, and the informant's participation was limited to identifying the defendant to a government agent who later used that information in preparing a photo array for the victim. *Id.* at 198-99. *See also United States v. Almodovar*, Crim. A. No. 96-71 MMS, 1996 WL 700267, at *8 (D. Del. Nov. 26, 1996) (stating that the government is not required to identify tipsters); *United States v. Beckett*, 889 F. Supp. 152 (D. Del. 1995) (holding that the government is required to provide information concerning confidential informants who will testify at trial).

In this case, the government does not intend to call the confidential informant as a witness in Roane's trial. Instead, the government will rely on testimony from law enforcement witnesses concerning the contact of Roane and his subsequent arrest. The informant was present for neither of these events, and his sole role in this case was to provide the police with information relating to defendant's location and his activity.

Under these circumstances, where the informant did not participate in the underlying contact and was not present during the recovery of illegal contraband, knowledge of the informant's identity will not serve to establish Roane's "guilt or innocence" and should not be

16

### III. CONCLUSION.

The Government respectfully submits that the defendant's motion should be denied for failure to establish any standing to contest the arrest of the defendant or the seizure of the evidence. However, if the Court concludes that standing has been established, the Government submits that the defendant's motion is without merit. Any claim that the Officers lacked reasonable suspicion fails as there was ample suspicion at the time of seizure. Furthermore, the defendant cannot contest the seizure of the contraband as it was located in an adjacent area and was abandoned property subject to recovery by police. Finally, the Government submits that it is not required to disclose the identity of its informant.

WHEREFORE, the United States respectfully asks the Court to deny the Defendant's *Motion*. Additionally, the Government submits that it is not required to disclosed the identity of its informant.

Respectfully submitted,

COLM F. CONNOLLY
United States Attorney

By: /s/ Shawn Martyniak
Shawn E. Martyniak (De. I.D. No. 4433)
Special Assistant United States Attorney
1007 Orange Street, Suite 700
P.O. Box 2046
Wilmington, Delaware 19899-2046

Dated: September 27, 2007.