IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action No. 07-48 GMS |
| ) | |
| TYRONE ROANE, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM**

**I.   INTRODUCTION**

On April 3, 2007, the Grand Jury for the District of Delaware indicted Tyrone Roane ("Roane") for possession with intent to distribute more than five grams of cocaine base, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B), possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A), and possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2). Presently before the court is Roane's Motion to Suppress Physical Evidence and Statements. The court held an evidentiary hearing in connection with this motion on September 5, 2007. The court subsequently directed the parties to file proposed findings of fact and conclusions of law. After having considered the testimony elicited during the hearing and the arguments presented in the parties' submissions on the issues, the court concludes that Roane does not have standing to raise a Fourth Amendment challenge. The court also concludes, in the alternative, that Roane was not seized for Fourth Amendment purposes until after he discarded the physical evidence. Accordingly, the court will deny Roane's motion for the following reasons.

## II.     FINDINGS OF FACT

At the evidentiary hearing, the United States called two witnesses: Brian Witte ("Witte"), a Wilmington police officer assigned to the Community Policing Unit[1], and Kurt Bryson ("Bryson"), also a Wilmington police officer assigned to the Community Policing Unit. Roane called one witness, Jaylisa Robinson ("Robinson"), the daughter of the owner of the home located at 2201 North Pine Street, Wilmington, Delaware. After listening to the testimony of each witness, and observing the demeanor of each, the court concludes that Witte's, Bryson's, and Robinson's accounts of the facts are credible. The following represents the court's essential findings of fact as required by Rule 12(e) of the Federal Rules of Criminal Procedure.

On March 29, 2007, Witte received information, "from a reliable source," that a black male wearing a black and white jacket was observed conducting a drug transaction at or near 2201 North Pine Street, Wilmington, Delaware.[2] (Transcript of Hearing on Defendant's Motion to Suppress ("Tr.") at 9.) Witte relayed this information to Officer Gordon ("Gordon") and Bryson, who responded to the location at approximately 2:00 p.m. (Id. at 9, 37-38.) According to Witte, Gordon and Bryson drove through the area in a marked vehicle and observed a black male matching the description given by the informant at the residence. (Id. at 9-10.) Bryson observed the person meeting the description sitting on the steps of the residence. (Id. at 37.) Bryson testified that the person looked toward him and Gordon in their marked police vehicle, and then walked into the

---

[1] Witte is assigned to the northern area of Wilmington and addresses community issues such as drug sales, traffic situations, and general concerns. (*See* Transcript of Hearing on Defendant's Motion to Suppress ("Tr.") at 8.)

[2] The only information Witte received from the informant was a description of the jacket that the male was wearing, and the fact that he was making a drug transaction. (Id. at 19, 21.)

house. (Id.)

After observing the person, later identified as Roane, the three officers met at 23rd and Jessup Streets to set up a plan to approach him. (Tr. at 10.) The plan called for the officers to go eastbound on 22nd Street, against the flow of traffic; Witte would stop his vehicle at the rear of the residence, and Gordon and Bryson would continue to go onto Pine Street to the front of the house where they had previously observed Roane. (Id. at 11.) According to Bryson, Witte wanted him to speak to Roane and tell him to stop. (Id. at 39.) With their plan set, the officers drove up 22nd Street, with Gordon and Bryson in front, and Witte behind them. (Id. at 11.) As they got closer to the house, Witte pulled over and exited his vehicle to maintain a visual on the back of the house. (Id.) Gordon and Bryson then drove around to the front of the house and observed Roane sitting on the steps next to a female.[3] (Id. at 39.) Bryson had his window open, and called out to Roane, "Hey, come here." (Id.) Roane looked in Bryson's direction, and immediately jumped up and ran up onto the porch. (Id.) Bryson continued to tell Roane to stop when he got onto the porch, but Roane continued to move toward the door of the house (Id.) Bryson then began to exit his vehicle and start heading towards Roane, who opened up the front door and went into the house. (Id. at 40.)

Gordon and Bryson ran up the steps, but Roane had gone into the house, shut, and locked the door by the time the officers reached it. (Id.) Bryson tried to open the door, but discovered it was locked. (Id.) Bryson proceeded to kick the door two times, but it failed to open. (Id. at 41.) Gordon then kicked the door open, and the two officers entered the residence with Gordon on the left and Bryson on the right. (Id.) Bryson observed an open living room, a set of steps that would go up to

---

[3] On cross-examination, Bryson testified that he had not observed Roane engaging in any drug transaction; "[h]e was just sitting on the steps next to the female." (Tr. at 46.)

the second floor of the house, and an opening to the left, which would go to the back of the house, or the rooms behind the living room. (Tr. at 41.)

Both officers drew their guns for protection and moved through the house, Bryson toward the steps and Gordon to the left toward the back of the house. (Id.) When Bryson got to the bottom of the steps, Gordon, who was already in another room, yelled "He's here. He's over here." (Id. at 42.) In response, Bryson began to move around the steps when he heard the "pop" from a taser.[4] (Id.) He continued moving toward the back of the house and observed Gordon standing right outside the back door, holding a taser. (Id.) The taser's wires, which were outside of the residence, extended over the fence. (Id.) Bryson observed Roane laying on the ground with Witte close by. (Id.) He then turned around to go out the front door and around the front of the house to assist Witte. (Id. at 42-43.)

During the period of time that Gordon and Bryson made their observations at the front of the house, Witte was positioned at the rear of the house. (Id. at 11-12.) Witte could see through the residence's six-foot, wooden privacy fence, and observed Roane run out of the back of the house. (Id. at 12.) Witte then ran on the outside of the fence, right along side Roane, who looked directly at Witte, turned around, and ran back toward the house. (Id. at 12-13.) According to Witte, as Roane ran back toward the house, he ran up onto a pile of rocks in the yard and made a throwing motion. (Id. at 13.) Witte then observed two white objects and a black object, which he believed to be a handgun, being thrown in the northern direction toward the rear yard of 2203 North Pine Street. (Id.)

---

[4] Bryson testified that the "pop" is a distinctive sound that one can hear. (Tr. at 42.)

After Roane threw the items over the fence, he began running again westbound toward the rear of the yard. (Tr. at 13-14.) Witte ran along with Roane, until Roane ran back up the steps toward the rear door to the house.[5] (Id. at 14.) By that time, Gordon had opened the rear door to the house. (Id.) Roane attempted to dive over the fence, and Gordon deployed his departmental taser.[6] (Id.) After being tasered, Roane landed on the sidewalk and started to jump up. (Id. at 15.) In response, Witte tackled Roane to the ground, and ordered him to place his hands behind his back. (Id.) Roane refused, instead placing his hands underneath him, and Witte punched him twice in the face with a closed fist. (Id.) At this point, Roane put his hands behind his back and Witte took him into custody without further incident. (Id.) After Roane's arrest, Witte responded to the back yard of 2203 North Pine Street, where he found a black Ruger .22-caliber handgun and two bags of crack cocaine. (Id. at 16.)

With respect to the confidential informant, Witte testified that he knew the informant for some time , and this person had previously provided a drug tip on one prior occasion. (Id. at 17-19.) According to Witte, no one was arrested as a result of the information provided, but an investigation was brought and the Wilmington police officers on the case were able to substantiate all of the information the informant had provided. (Id.)

---

[5] Witte did not go into the back yard of 2201 North Pine Street prior to Roane's arrest, because the fence was locked and he could not gain access. (Id. at 14.) Witte, however, did attempt to kick in the fence before seeing Roane run out of the house, because Bryson had advised him the Roane had entered the house. (Id. at 29, 34.)

[6] Witte testified that Roane discarded the objects over the fence prior to being tasered by Gordon. (Id. at 15-16.)

5

Robinson testified for the defense regarding her recollection of events occurring the day that Roane was arrested. Robinson resides at 2201 North Pine Street with her mother, Victoria Jones ("Jones"), who owns the residence. (Tr. at 49.) At that time, Robinson had known Roane for approximately a year and a half, and testified that Roane is her "godfather," but not in the legal sense of the term. (Id. at 49, 56.) Roane had visited Robinson at her home on several occasions and, on March 29th, was fixing a flat tire across 22nd street. (Id. at 50-52.) Roane entered the house with Robinson's consent two times to wash his hands, and then sat with Robinson on the steps of the house. (Id. at 51-52, 55.) According to Robinson, while Roane was sitting on the steps, he stated that he had to use the bathroom, and "as soon as he got up, the police car came, then they [the officers] started running." (Id. at 52.) Robinson did not hear the police speak to Roane as he got up, but testified that when Roane got to the door, the cops "hopped out" of their vehicles, started to run, "bum-rushed" her, and kicked in the door. (Id. at 53-54.)

Robinson asked the officers what they were doing, and they continued to kick and push at the door. (Id. at 53.) Robinson testified that two or three more police cars arrived and began to help the officers kick in the door. (Id. at 54.) At that point in time, she again asked the officers what they were doing, and they took out a gun, told her to get back, and chased her across the street.[7] (Id.) Robinson testified that she saw Roane after his arrest, while in handcuffs, and that the officers punched him in his face and tasered him. (Id. at 55.) She also testified that she was not paying attention to the details of the incident, because she "just wanted to know what they [the officers] were doing." (Id. at 61.)

---

[7] Robinson later testified that the officers did not push or touch her, but "it was to the point where [she] actually went across the street." (Tr. at 63.)

According to Robinson, she was not permitted to have company in the home when her mother was not present. (Tr. at 56.) Robinson also testified that Roane was not supposed to be in her house at all. (Id. at 59.) Additionally, Robinson was able to observe the incident taking place, because she was not in school on the day of Roane's arrest. (Id. at 57, 59.)

### III.   CONCLUSIONS OF LAW

Roane seeks to suppress admission of the physical evidence seized by the police officers on March 29, 2007, as well as any statements made during, or subsequent to, his arrest. Roane makes two arguments in support of suppression: (1) the officers lacked reasonable suspicion to conduct the investigative stop that led to his arrest because the stop was based on a tip provided by an unreliable informant; and (2) the officers' warrantless entry into 2201 North Pine Street was a violation of his reasonable expectation of privacy in the home of another. In response, the government argues that Roane lacks standing to challenge the officers' entry into Jones' residence, because he had no reasonable expectation of privacy in that residence. The government further argues that the officers had a reasonable suspicion to stop Roane, and that he had abandoned the firearm and cocaine prior to being "seized."

####   A.   Standing

The Fourth Amendment prevents "unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment right to be free from unreasonable searches and seizures, however, is a personal right, and a defendant must establish standing to assert that right. *See United States v. Hebron*, 243 F. Supp. 2d 90, 92 (D. Del. 2003) (citing *United States v. Padilla*, 508 U.S. 77, 81-82 (1993)). The defendant bears the burden of establishing standing to raise a Fourth Amendment challenge. *See Rakas v. Illinois*, 439 U.S. 128, 130 n. 1 (1980). To establish standing, a defendant

must demonstrate that he had a reasonable expectation of privacy in the property searched. *See Rawlings v. Kentucky*, 448 U.S. 98, 104-05 (1980) (citations omitted). "A subjective expectation of privacy is legitimate if it is 'one that society is prepared to recognize as "reasonable."'" *Minnesota v. Olson*, 495 U.S. 91, 95-96 (1990) (quoting *Rakas*, 439 U.S. at 143-44 n. 12.)

The Supreme Court's jurisprudence is clear that a person need not own or rent a property in order to have a legitimate expectation of privacy in it. *Rakas*, 439 U.S. at 142. Additionally, the Supreme Court has held that a person's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Olson*, 494 U.S. at 96-97. In reaching its conclusion in *Olson*, the Court discussed the dynamic between an overnight houseguest and a host, noting that "[s]taying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society." *Id.* at 98.

In *Minnesota v. Carter*, the Court discussed its Fourth Amendment jurisprudence and further refined its houseguest analysis. 525 U.S. 83, 89-90 (1998). Specifically, the Court discussed and distinguished the holdings in *Jones v. United States*, 362 U.S. 257 (1960),[8] and *Olson*, noting that the overnight guest in *Olson* typifies "those who may claim the protection of the Fourth Amendment

---

[8] In *Jones*, the defendant sought to exclude evidence resulting from the search of a friend's apartment. In moving to exclude the evidence, the defendant relied on the following facts: (1) he had been given the use of the apartment by a friend and had a key to the apartment; (2) he had clothing in the apartment; (3) he had slept in the apartment one night; and (4) at the time of the search, he was the only occupant of the apartment. 362 U.S. at 259. The Court held that the search violated the defendant's Fourth Amendment rights. The court further stated that "anyone legitimately on the premises where a search occurs may challenge its legality." *Id.* at 267. This latter statement or standard, however, was expressly rejected by the Supreme Court in *Rakas*. 439 U.S. at 141-42 ("We think that *Jones* on its facts merely stands for the unremarkable proposition that a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place.").

in the home of another," while "one merely 'legitimately on the premises,'" i.e. merely present with the consent of the householder, typifies "those who may not" claim Fourth Amendment protection. *Id.* at 91.

In the present case, Roane lacks standing to assert a Fourth Amendment challenge, because he did not have a reasonable expectation of privacy in Jones' residence at 2201 North Pine Street. Looking to the totality of the circumstances surrounding Roane's status vis-a-vis Jones' house, the court finds that it is precisely the situation of a person merely present with the consent of the householder – the situation under which a person may not claim Fourth Amendment protection. Roane does not own or lease 2201 North Pine Street. Further, unlike the situation in *Olson* or *Jones*, Roane was not an overnight guest at 2201 North Pine Street. Indeed, the evidence adduced during the hearing demonstrates that, at most, Roane had visited Robinson at her residence several times in the past. Additionally, although Roane did have permission to enter the residence that day, his permission to enter the home was limited to washing his hands. (See Tr. at 51-52, 55.) Based on these facts, the court concludes that Roane, a person merely present with the consent of a resident of the home,[9] may not claim Fourth Amendment protection, because his subjective expectation of privacy is not legitimate – that is, not one that society is prepared to recognize as reasonable. Thus, the court will deny the defendant's motion. Nevertheless, even assuming that Roane had standing to raise a Fourth Amendment challenge to his seizure and the evidence resulting from the seizure,

---

[9] Arguably, Roane's situation is even more attenuated than that of one who is present with the householder's consent, because Jones, the householder, did not consent to his being in the home. Rather, it was her fifteen year old daughter, Robinson, who gave Roane permission to enter the home to wash his hands. Moreover, Robinson was not permitted to have anyone in the home when her mother was not present. (Tr. at 56.) Accordingly, Roane was not supposed to be in Jones' house at all. (Tr. at 59.)

9

the court would deny his motion because, as set forth below, no Fourth Amendment violation occurred.

### B.  Seizure and Abandonment

The crux of Roane's suppression argument is that the court should suppress all evidence obtained after his arrest, because the officers lacked reasonable suspicion to stop him. A police officer "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)); *see also Terry v. Ohio*, 392 U.S. 1, 22-24 (1968). Under *Terry* and its progeny, reasonable, articulable suspicion of criminal activity has been defined as "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry*, 392 U.S. at 21. Courts must consider the "totality of the circumstances" in determining whether such reasonable suspicion existed. *See United States v. Sokolow*, 490 U.S. 1, 8 (1989).

The Supreme Court has held that a seizure occurs for purposes of the Fourth Amendment in the context of an arrest or investigatory stop when either (1) the police officers apply physical force to a suspect, or (2) the suspect submits to an officer's show of authority. *California v. Hodari D.*, 499 U.S. 621, 626-27 (1991). A show of authority by officers to which a subject does not stop is insufficient to constitute a seizure. *Id.* Put differently, an "attempted seizure[] of a person [is] beyond the scope of the Fourth Amendment." *County of Sacramento v. Lewis*, 523 U.S. 833, 845 n. 7 (1998).

In *Hodari*, the officers involved in the arrest were on patrol in a high-crime area of Oakland California, and observed four or five youths huddled around a small red car. 499 U.S. at 622. The

youths began running when they saw the officers' car approach. *Id.* at 622-23. The officers became suspicious of the flight and gave chase. *Id.* at 23. One of the officers pursued the youths on foot, following Hodari down the street. *Id.* As the officer was almost upon him, Hodari discarded a small rock that was later determined to be cocaine. *Id.* A moment later, the officer tackled Hodari and handcuffed him, placing him under arrest. *Id.* Hodari moved to suppress all evidence relating to the cocaine, and the issue before the Supreme Court was "whether, at the time he dropped the drugs, Hodari had been 'seized' within the meaning of the Fourth Amendment." *Id.* The Court concluded that the officer's pursuit constituted a "show of authority," but also concluded that Hodari was not seized until he was tackled, since he did not comply with the officer's show of authority. *Id.* at 629. The Court then reasoned that the cocaine abandoned while Hodari was running was not the fruit of the poisonous tree, and denied the motion to suppress. *Id.*

After having considered the totality of circumstances in this case, the court concludes that the facts fall within the Supreme Court's *Hodari* decision. Officer Witte received a tip from an informant that a black male wearing a black and white jacket was observed conducting a drug transaction at or near 2201 North Pine Street. (Tr. at 9.) Officers Gordon and Bryson received the information from Witte and proceeded to patrol the area around 2201 North Pine Street. (Id. at 9, 37-38.) While patrolling, the officers observed a black male matching the informant's description standing on the front porch steps of 2201 North Pine Street. (Id. at 37.) The black male walked into the house after seeing the police officers. (Id.) Gordon and Bryson again drove to the front of 2201 North Pine Street, and observed the black male sitting on the front steps, this time with a female. (Id. at 39.) Bryson had his window open and said to Roane "Hey, come here." (Id.) In response, Roane looked in Bryson's direction and began running up to the porch, and into the house. (Id.)

Gordon and Bryson pursued Roane, reaching the front door of the house shortly after Roane had entered and locked the door. (Tr. at 40.) Bryson tried to open the door and, upon discovering that it was locked, proceeded to kick it in with Gordon's assistance. (Id. at 41.) During this time, Roane ran out the back door and made eye contact with Witte. (Id. at 12-13.) Roane then began to run back toward the house, stepped onto a pile of rocks in the backyard, and made a throwing motion. (Id. at 13.) Witte observed Roane throw two white objects and a black object, which he believed to be a handgun, into the backyard of 2203 North Pine Street (the adjacent residence). (Id.) Roane proceeded to run back up the rear steps of the house, where he was confronted by Gordon and attempted to dive over the property's fence. (Id. at 13-14.) Gordon then deployed his taser on Roane.[10] (Id. at 14.)

The record does not indicate that the officers applied physical force to Roane prior to deploying the taser on him. Additionally, Roane did not submit in any way or yield to Bryson's initial show of authority, or to Gordon's and Bryson's show of authority in pursuing him, prior to being tasered. As such, when applying the standards set forth in *Hodari*, the court concludes that Roane was not seized for Fourth Amendment purposes until after Gordon deployed the taser on him.[11]

---

[10] The government concedes that Roane was in custody after Gordon tasered him.

[11] Much of the defendant's briefing is devoted to the reliability of the source who provided the information to Witte. Put another way, the defendant's "reasonable suspicion" argument is predicated on the fact that the officers made the decision to stop him based on an unreliable informant's tip. The argument is unavailing. The defendant cites many cases concerning the reliability of an anonymous tip and its corroboration requirement. The court, however, finds the facts of those cases inapposite, as they relate to anonymous informants with no history of reliability. Here, Witte testified that the informant was a "reliable source." (Tr. at

Having concluded that Roane was not seized for Fourth Amendment purposes prior to being tasered, the court further concludes that the officers did not violate Roane's rights when they recovered the property he discarded into the adjacent backyard. A warrantless search and seizure of abandoned property does not violate the Fourth Amendment. *Abel v. United States*, 362 U.S. 217, 241 (1960); *see Hodari*, 499 U.S. at 629 ("In sum, assuming that [the officer's pursuit of Hodari] constituted a 'show of authority' enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled. The cocaine abandoned while he was running was in this case not the fruit of a seizure. . . ."); *United States v. Fulani*, 368 F.3d 351, 354 (3d Cir. 2004) (noting that a person forfeits a privacy interest in property when he abandons it). Indeed, "[t]here can be nothing unlawful in the Government's appropriation of such abandoned property." *Id.* Given the foregoing analysis, the court will deny the defendant's motion to suppress.

Dated: October 29, 2007                    /s/ Gregory M. Sleet
                                           CHIEF, UNITED STATES DISTRICT JUDGE

---

9.) To support that assertion, Witte further testified that he had known the informant for some time, and that the informant had previously provided reliable information concerning a drug transaction on one prior occasion. (Id. at 17-19.) Further, while the defendant makes much of the fact that the informant's tip did not lead to an arrest, he cites no authority for the proposition that an informant's tip is considered reliable only when it leads to an arrest. Here, the informant provided Witte a reliable tip on one other occasion. The tip did not lead to an arrest, but the Wilmington Police brought an investigation and the officers on the case were able to substantiate all of the information the informant had provided. Based on the totality of the circumstances, the court finds that the informant in the present case had a history of reliability, and the tip was reliable. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983) (abandoning rigid two-prong test for informant reliability in favor of a totality of the circumstances test).

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action No.  07-48 GMS |
| ) | |
| TYRONE ROANE, ) | |
| ) | |
| Defendant. ) | |

**ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The defendant's Motion to Suppress Physical Evidence and Statements (D.I. 11) is DENIED.

Dated: October29, 2007          /s/ Gregory M. Sleet
                                CHIEF, UNITED STATES DISTRICT JUDGE